269 F.2d 755
 COLORADO MILK TRANSPORT, INC., a Colorado corporation; Ray Biederman, d/b/a Franktown Truck Line; Hubert Hall, d/b/a Denver-Parker Truck Line; Leonard Waldren, d/b/a Hill Top Denver Truck Line; John David, Jr., d/b/a Smoky Hill Truck Line; Bot Lantz, d/b/a Lantz Truck Line; Walter I. Adams, d/b/a Bear Creek Milk Line; and H. R. Teller, Appellants,
v.
SAFEWAY STORES, INCORPORATED, d/b/a Lucerne Milk Company, Appellee.
 No. 6019.
 United States Court of Appeals Tenth Circuit.
 August 5, 1959.
 
 Paul M. Hupp, Denver, Colo., David Rosner, Denver, Colo., on the brief, for appellants.
 Peter H. Dominick and William C. McClearn, Denver, Colo., Holland & Hart, Denver, Colo., on the brief, for appellee.
 Before BRATTON, Chief Judge, and HUXMAN and LEWIS, Circuit Judges.
 HUXMAN, Circuit Judge.
 
 
 1
 While the caption of this case contains a considerable number of plaintiff-appellants, as the case was finally shaped up and tried, it was a case between Colorado Milk Transport, Inc., as plaintiff, and Safeway Stores, Inc., d/b/a Lucerne Milk Company, and therefore, our reference will be made only to such parties, and they will be generally referred to herein as Colorado Milk Transport, Inc., and Lucerne.
 
 
 2
 Colorado Milk Transport, Inc. filed a complaint against Lucerne in the United States District Court for the District of Colorado. In the first count of a second amended complaint it was alleged that plaintiff was engaged in the transportation of milk upon the highways of Colorado; that Lucerne was engaged as a common carrier in the transportation of milk upon the highways without first having obtained a certificate of convenience and necessity; that as a result of such action, Colorado Milk Transport, Inc. had suffered and was suffering financial and economic loss. In a second cause of action, it was alleged that Colorado Milk Transport, Inc., was engaged in the transportation of milk upon the highways; that Lucerne was engaged in the business of transporting on the highways, for compensation, milk of others in violation of applicable Colorado statutes and that because thereof Colorado Milk Transport, Inc., was suffering financial and economic injury. Injunctive relief and damages were sought in each cause of action under C.R.S., 1953, Chapter 115-9-24, and 115-11-21.
 
 
 3
 Colorado, by statutes, requires common carriers to obtain certificates of convenience and necessity before engaging in such business. It also requires private or contract carriers by motor vehicle to obtain authorizing certificates before acting as such.[1]
 
 
 4
 Trial was had to the court. The court made detailed findings of fact, and, based thereon, concluded as a matter of law that Lucerne was not engaged as a common carrier in the transportation of milk, nor was it engaged in such activities as a private or contract motor vehicle carrier, and was not in violation of the provisions of Chapter 115, Article 9, Colorado Revised Statutes, or Chapter 115, Article 11, 1953, Colorado Revised Statutes. Based on its findings and conclusions of law, judgment was entered for Lucerne for costs and the amended complaint was dismissed with prejudice.
 
 
 5
 While five assignments of error are urged for reversal, there is but a single issue in the case — did the trial court err in finding that Lucerne was not acting either as a common carrier or as a private or contract carrier by motor vehicle, and was, therefore, not in violation of Chapter 115, Article 9, 1953, C.R.S.
 
 
 6
 A careful analysis of the record compels the conclusion that the trial court's findings and conclusions of law are amply sustained by the record and that the judgment must be affirmed. It is not necessary to set out in detail the applicable Colorado law. It is sufficient to say that thereunder a common carrier must have a certificate of convenience and necessity and a private or contract carrier must have an authorizing certificate before engaging in such business, and that one failing to comply with the law is subject to damages caused to others.
 
 
 7
 There is really not much conflict in the evidence. The question is primarily one of the permissible deductions which must be drawn therefrom. Admittedly, Colorado Milk Transport, Inc., is a common carrier engaged as such in the transportation of milk over established routes; but what of Lucerne? If it, in fact, buys all the milk it transports to its processing plant in Denver, f. o. b. at the producers' stations, it is neither a common carrier nor a private or contract carrier for hire, because it then hauls only its own property. Appellant's whole case is pitched on the contention that Lucerne is, in fact, buying this milk f. o. b. Denver, that it does not become its property until it reaches its plant in Denver, that the new arrangement is a sham to cover up the real transaction, and that the so-called area farm differentials, hereinafter referred to, are, in fact, freight rates charged for transporting the producers' milk to the plant.
 
 
 8
 These facts find support in the record. In fact, there is no dispute concerning them. In 1953, Colorado Milk Transport, Inc., was incorporated. It was a consolidation of several previously independent milk haulers. It is authorized to do business as a motor vehicle common carrier of milk from farms in northern Colorado. It transports milk both by can and in bulk from its certified area to processing plants in Denver.
 
 
 9
 Safeway Stores, Inc., owns and operates retail food stores in a great number of states, including Denver, in Colorado. Lucerne Milk Company, an unincorporated division of Safeway Stores, Inc., procures and processes milk and milk products for sale at retail in the various Safeway retail stores.
 
 
 10
 Lucerne operates a milk processing plant in Denver, Colorado. It obtains its raw milk supply from dairy farmers or producers located generally in northeastern Colorado. Prior to the summer of 1953, Lucerne, together with all milk processing plants in the Denver area, received raw milk from its producers in ten-gallon cans. Such cans were transported from the producers' farms to the various milk plants, including that of Lucerne, by independent milk haulers. Each can was tagged with the name of the producer who shipped it, and was inspected for odor, flavor, and quality, upon receipt at Lucerne's plant in Denver. If the milk failed to pass inspection there, it was returned to the producer. In addition, upon the receipt of the milk in cans, at its plant, Lucerne ascertained the weight of the milk and took butterfat samples. The price paid to its producers was based on these factors. Under the can method of milk procurement, Lucerne only paid its producers for milk which it received and accepted at its plant in Denver.
 
 
 11
 In late 1952, Lucerne decided to convert its operations to what is known as the bulk method of milk procurement. Under this method, each producer purchased a refrigerated stainless steel bulk tank which was installed at the farm. These tanks varied in capacity and contained a calibrated measuring device so that the weight of the milk could be computed in the bulk tank at the farm. Under the bulk method, Lucerne's employees inspect the raw milk in the tank at the producer's farm, and accept or reject it at that point. If the milk is accepted by Lucerne, it is pumped into its bulk trucks and commingled with other milk. Lucerne pays its producers for all milk pumped into its trucks and assumes all risk of loss and spoilage to the milk thereafter. When the weight of the producer's milk is ascertained at the farm, he is given a receipt therefor by the driver. At the same time the driver takes a sample of the milk from the producer's tank. This sample is taken to Lucerne's laboratory in Denver, where it is analyzed to determine the butterfat content of this milk. At the time Lucerne converted to the bulk method of milk procurement, there were no other carriers in Colorado authorized to handle the milk in bulk.
 
 
 12
 The court found that when Lucerne began converting to the bulk method, it contacted only those producers who were already selling their milk to it. That thereafter it contracted to buy milk from other producers, but in each case the new producer initially contacted Lucerne. While some attack is made upon this finding by the court, we think it is sustained by the record. But, in any event, it is not decisive of the issues presented. From time to time Lucerne purchased additional bulk tanks and at the time of the trial, owned and operated five such trucks at its Denver plant. Lucerne had the required permit for the operation of these trucks on the highways.
 
 
 13
 Milk is divided into several classes of grades and the minimum price fixed for each grade is a negotiated price recommended by the Denver Milk Producers, Inc., a cooperative marketing association. Each month all dairies report to the association how much milk they have purchased and the butterfat content thereof, and also how much milk was used and sold in various classes. These figures are all totaled up and a blended price is arrived at. It is this price, less various deductions made by the association, which constitutes the minimum price paid to producers. Denver Milk Producers, Inc. acts only as agents for its members and does not buy or sell any milk itself, but the information with respect to established and recommended prices is made available to those who are not members of the association. Lucerne was formerly, but not at the time of trial, a member of the association.
 
 
 14
 The price which Lucerne pays to its producers is arrived at in the following manner. At the time it started operating under the bulk system, it made a survey of the cost of operating the trucks and, based thereon, established a system of area differentials to be used in computing the price of milk to be paid each of the producers at their farms. The price paid was the blended price established by Denver Milk Producers, Inc., plus bonuses or premiums to which each producer was entitled, less the area differential which Lucerne considered the cost of hauling the milk to its plant. This method of computing the price was also explained to Denver Milk Producers, Inc., and was approved by it. From time to time, Lucerne reduced the area differentials so that they equaled the actual direct cost of operating its bulk milk trucks as nearly as possible.
 
 
 15
 The court found, and the record sustains this finding, that while Lucerne made substantial profits from its over-all milk business, it made no profit from the operation of its bulk milk trucks during the period from the inception of the operation to the date of trial.
 
 
 16
 Colorado Milk Transport, Inc., concedes that Lucerne could purchase milk at the producers' stations, take title thereto at the farm, and then transport it to its processing plan in Denver without incurring the impact of regulatory laws. But its contention is that the new plan is essentially the same as the old one and is but a scheme and subterfuge to cloak the same operations and evade the effect of the applicable Colorado Regulatory Statutes. Thus it contends that the milk is, in fact, still being bought f. o. b. Denver. To support this contention, it is emphasized that the base price paid for the milk is a blended f. o. b. Denver price to which are added bonuses, etc., and then deducted are the area differential charges. Its contention is that this differential is, in fact, a charge for hauling the producer's milk to the plant. The record does not sustain this contention.
 
 
 17
 The record is clear that Lucerne, from time to time, sought to ascertain as nearly as possible the actual charge to it of operating its trucks on the highways in the transportation of the milk it bought at the producing stations. The fact that Lucerne used the Denver f. o. b. price as a base price it paid its producers, does not make it an f. o. b. Denver transaction. It could agree to purchase milk at the farm for that price, less the cost of hauling it to its plant. One who engages in the business of transporting property of others, does so for profit. The transportation charge always contemplates a recovery of the cost of operation, plus a fair profit. There is nothing in the record to impeach the court's finding that Lucerne sought to recover only its cost of transporting the milk and that it did not make a profit from its hauling operations.
 
 
 18
 The case of West v. Western Maryland Dairy, 150 Md. 641, 135 A. 136, is clearly distinguishable on the facts. In that case, the milk processed by Western Maryland Dairy was not purchased by it from the producers. All milk was sold by the producers to the Maryland State Dairymen's Association which, in turn, sold it to various producers. All the milk purchased by Western Dairy was purchased from Maryland State Dairymen's Association. Some of the milk which it bought from the association was transported in its own trucks, other milk was transported by rail, and some by other truckers. When milk was transported by rail, the price agreed upon was the amount to be received therefor at the roads terminal station in the City of Baltimore. When it was transported by trucks, whether those of Western Maryland Dairy or independent truckers, the price agreed upon was the amount to be paid therefor at the plant of Western Maryland Dairy. The cost of all transportation was paid by the producers. When the milk was transported in trucks of Western Maryland Dairy, the amount due was not ascertained and determined until it reached the plant where it was inspected and weighed, and either accepted or rejected. If accepted, the Dairy deducted and retained from the price, transportation charges in "an amount equal to and in some cases greater than that which had been charged for the same haul by the individual or company whose routes it had purchased."
 
 
 19
 The Western Maryland Dairy case, supra, was distinguished by the same court in Weller v. Kolb's Bakery & Dairy, 176 Md. 191, 4 A.2d 130, on the ground that it was not the intention of the parties that title should pass before the milk was accepted at the plant. It is our conclusion that the court correctly found and held that Lucerne was neither a common carrier nor a private or contract carrier as those terms are defined by statute, and that it bought this milk at the producers' stations, took title thereto, and thereafter transported its property to its processing plant.
 
 
 20
 Affirmed.
 
 
 
 Notes:
 
 
 [1]
 Sections 300-326, Chapter 16, Volume 2, 1935 C.S.A